IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ISIAH CLAYTON, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 4:23-CV-04251 |
| | § | |
| KERRVILLE BUS COMPANY and COACH USA., | § | JURY DEMANDED |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

ISIAH CLAYTON ("Plaintiff"), files this lawsuit against KERRVILLE BUS COMPANY and COACH USA ("Defendants") to recover damages and for cause of action would show the following:

### I.   NATURE OF CLAIMS

1. This action is filed under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, to correct unlawful employment practices, including Defendants' discrimination on the basis of Plaintiff's race and retaliation due to his protected complaints.

2. This action is also bought under 42 U.S.C. §1981 ("Section 1981") for Defendants' discrimination on the basis of Plaintiff's race and retaliation due to his protected complaints.

3. Plaintiff seeks equitable relief, back and future pay, lost benefits, reinstatement, liquidated, compensatory and punitive damages for violations of Title VII and Section 1981 suffered by Plaintiff during his employment by Defendants.

## II. JURISDICTION AND VENUE

4. The action arises under a federal question as hereinafter more fully appears.

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1391 (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and it is the district in which the Defendants' business is located and operated.

## III. THE PARTIES

6. Plaintiff Isiah Clayton is an African American citizen of the United States and the State of Texas and resides in Harris County, Texas. Plaintiff is a former employee of Defendants.

7. Coach USA and Kerrville Bus Company operate as an integrated enterprise and are a provider of ground passenger transportation and mobility solutions throughout the United States and Canada through Coach USA's affiliates and subsidiaries.

8. Defendant, Coach USA, is engaged in business, among other locations, in Harris County, Texas. Service of Process may be accomplished by serving its registered agent, CT Corporation System at 1999 Bryan St, Ste 900, Dallas, Texas 775201

9. Defendant, Kerrville Bus Company, a wholly owned affiliate and subsidiary of Coach USA, is engaged in business, among other locations, in Harris County, Texas. Service of Process may be accomplished by serving its registered agent, CT Corporation System at 1999 Bryan St, Ste 900, Dallas, Texas 775201

10. At all times relevant hereto, Plaintiff was jointly employed by Defendants at their Houston office located at 1800 Delano St., Houston, Texas 77003.

11. At all times relevant to this complaint, the Defendants employed 15 or more employees and are employers within the meaning of Title VII and Section 1981.

### IV.    CONDITIONS PRECEDENT

12.     On January 24, 2023, Plaintiff timely filed a Charge of Discrimination against the Defendants with the Houston Division of the Equal Employment Opportunity Commission, EEOC Charge No. 460-2023-02586. Plaintiff received a right to sue from the EEOC on August 22, 2023. Plaintiff files this complaint within 90 days of receiving the notice of right to sue. All conditions precedent to filing this lawsuit have been performed or have occurred.

### V.    BACKGROUND AND FACTS

13.     Plaintiff incorporates by reference all of the allegations set forth above.

14.     Mr. Clayton began his career with Coach USA and its wholly owned subsidiary, Kerrville Bus Company, on August 13, 2012. Defendants operated as an Integrated Enterprise and Joint Employers of Mr. Clayton. Mr. Clayton was hired as a head dispatcher and thoroughly and competently completed all the work expected of him. Mr. Clayton was more than qualified for his position and Coach was very well aware of this fact, as indicated by a positive ten-year working relationship with no write-ups, disciplinary actions, or negative evaluations. Mr. Clayton came to this company with ample experience and extensive skills and qualifications. Further, Coach quickly promoted Mr. Clayton to a management position after acknowledging his skills and talents for management.

15.     While working as a head dispatcher, Mr. Clayton was assured by Coach that he had a manager position awaiting him if he transferred to Dallas, Texas. As such, Mr. Clayton transferred to the Dallas location and worked there for over two and a half years as an Operations Manager (OM). Mr. Clayton remained efficient and hard-working at his job only producing the highest quality of work. While in Dallas, Mr. Clayton was then asked to transfer to San Antonio, since another employee had apparently been promised his position in Dallas. Once again, Mr.

Clayton obliged and moved to San Antonio. Mr. Clayton worked in San Antonio for a year and a half when a position opened up in Houston, Texas. While working in Houston under his supervisor, Rich Funke (hereinafter "Mr. Funke"), Mr. Clayton was requested to return to San Antonio in October of 2018 in order to accept a role for which he had previous experience and because the employee who had been in that role went on an extended sick leave. However, this position was essentially a demotion for Mr. Clayton, and therefore Mr. Clayton declined this position. Little did Mr. Clayton know at the time; Coach wouldn't afford him the opportunity or discretion to choose his position. Coach completely disregarded Mr. Clayton's denial and rejection of the demotion. To add salt to his wounds, Coach had Mr. Clayton pick up his intended replacement, Nick Tozouno (hereinafter "Mr. Tozouno"), a white male, from the airport and introduce him to the team in the office prior to letting him know the purpose of Mr. Tozouno's trip.

16.     The next day, Mr. Clayton came to work to speak to management about the situation. He also expressed his concerns to dispatcher, Allen Willie (hereinafter "Mr. Willie"). Mr. Tozouno then realized what had transpired, as he was previously unaware, and thereafter made a complaint to the corporate office while simultaneously withdrawing from the position wanting no part in the unfair treatment to which Coach was subjecting Mr. Clayton. In response, Coach's leadership, Scott Sprengel (hereinafter "Mr. Sprengel"), created an Assistant General Manager position specifically for Mr. Tozouno to transfer to in New Jersey.  Mr. Tozouno then transferred to New Jersey.

17.     When Mr. Tozouno transferred to New Jersey, he invited Mr. Clayton to join him in New Jersey. It is important to note that Coach only had two African American General Managers within the company. At this juncture, Mr. Clayton was advised by the other two African American General Managers in New Jersey to transfer out of Texas. Mr. Clayton understood why they made

this suggestion since he had personally experienced disparate treatment at Coach. For instance, whenever he and other Black colleagues would attend meetings, they were constantly isolated and disregarded.

18. Nevertheless, while Mr. Clayton remained in Houston, he was regularly pushed by Mr. Funke to transfer to San Antonio. In July of 2019, Mr. Sprengel had a fellow Black colleague from New Jersey, Newell Scoon (hereinafter "Mr. Scoon") called in to Houston only to inform Mr. Clayton that Mr. Funke was soon to be terminated and replaced with another African American General Manager. Mr. Clayton was told by Mr. Scoon that Mr. Scoon was well aware of his situation in Houston and reassured him that the replacement would 'take care' of him. Mr. Clayton was specifically told that Mr. Sprengel had directed Mr. Scoon to inform Mr. Clayton of all this because Mr. Sprengel was well aware of how Mr. Clayton was being held back by the company in a number of ways. Even Mr. Sprengel acknowledged that Mr. Clayton's race impacted how Coach treated him and subjected him to disparate treatment.

19. Therefore, in August of 2019, Brian Rodgers (hereinafter "Mr. Rodgers") replaced Mr. Funke. Upon being hired, Mr. Clayton requested a meeting with Mr. Sprengel and Mr. Rodgers. Mr. Sprengel, however, declined the meeting with Mr. Clayton and instead directed Mr. Clayton to meet with Mr. Rodgers and Mr. Scoon. During this meeting, Mr. Clayton openly expressed to Mr. Rodgers that he felt that Coach favored white employees over Black employees and confided in him regarding the racial discrimination he experienced at Coach. Specifically, Mr. Clayton expressed to Mr. Rodgers that Coach kept all the White executives on an "executive" payroll while it kept the African American executives on the "regular" payroll. Mr. Clayton also explained that the White executives were not on the same vacation/sick leave list as the Black executives, which Mr. Clayton found very odd. Mr. Clayton expressed to Mr. Rodgers the disparate

treatment that African Americans, including himself, were subjected to by Coach. Due to this complaint, Mr. Rodgers notified Mr. Clayton three weeks later that he was adding Mr. Clayton to the executive payroll, the one on which his similarly situated White colleagues had been. Thus, he would be receiving two checks and simultaneously receiving a $5,800 increase in salary.

20. Mr. Clayton and Mr. Rodgers had a positive working relationship, enough to have Mr. Clayton express his concerns to Mr. Rodgers and trust Mr. Rodgers as a mentor. Mr. Rodgers would regularly tell Mr. Clayton that Coach didn't believe two black "boys" could successfully run the company (referring to himself and Mr. Clayton") but that they were going to "show them different." Prior to Mr. Rodgers coming on board, Mr. Clayton had explored legal avenues to remedy the disparate treatment he was subjected to by Coach, however, after Mr. Rodgers joined the team, Mr. Clayton felt that his situation would become better and instead gave Coach the benefit of the doubt while even foregoing legal remedies. Mr. Clayton developed trust in Mr. Rodgers and perceived him as a mentor. However, this relationship eventually turned sour.

21. In December of 2020, Mr. Clayton gained knowledge about Mr. Rodgers' complete disregard for company rules. Mr. Clayton noticed that Mr. Rodgers would very regularly violate many company policies, as well as laws. Mr. Rodgers would send company drivers who had failed their Department of Transportation physicals to another clinic in which they were guaranteed to pass. Afterwards, Mr. Rodgers would put these drivers to work, creating safety hazards. Uncomfortable with what he was witnessing, Mr. Clayton felt that he had no choice but to report Mr. Rodgers for his violations. Therefore, Mr. Clayton made an anonymous complaint pursuant to Coach's whistleblower policy fearing retaliation. Unfortunately, Mr. Clayton would soon find out that despite his complaint allegedly being anonymous, Coach employees were disclosing identities of those who filed such complaint while disregarding the purpose of

anonymity and thus retaliation would then follow in full force.

22. Mr. Rodgers' violations of company policies and carelessness of safety violations only increased. Although Mr. Clayton did not want to be retaliated against due to a complaint, he knew that he could not hold his tongue and essentially allow a safety hazard to exist thereby causing physical harm to employees and the general public. Although Mr. Clayton's complaint was anonymous, Mr. Clayton was absolutely certain that Mr. Clayton's complaint had been disclosed to Mr. Rodgers because he noticed Mr. Rodgers' difference in treatment towards him. Further, shortly after, when Mr. Rodgers came to visit the Houston location for a week, he made several comments to Mr. Clayton that inferred that he had knowledge of the complaint. During this week, Mr. Rodgers said nothing directly to Mr. Clayton about any complaint. Therefore, Mr. Clayton was completely bewildered to find out that towards the end of the week, Mr. Rodgers left the premises in a very angry state. Mr. Clayton was told that Mr. Rodgers aggressively tore things off the wall, he had been cursing and demanding employees to clean the facility, and he had created a list of things that needed to be done. Mr. Clayton was very surprised because Mr. Rodgers hadn't said a word all week and all of this was unexpected. Therefore, Mr. Clayton decided to directly email Mr. Rodgers while also copying Mr. Sprengel and Michelle Hartigan (hereinafter "Ms. Hartigan"), the Human Resources Corporate Manager, on the email. Although Mr. Sprengel and Ms. Hartigan never responded, Mr. Rodgers did.

23. On February 23, 2021, Mr. Clayton sent a follow up email to Coach's legal counsel, two other individuals from the administration, and copied the CEO, Linda Burtwhistle. In this email, Mr. Clayton reiterated his concerns on racial discrimination at Coach, although he received no response. On March 10, 2021, Mr. Clayton participated in a zoom meeting where he finally found out that Mr. Sprengel had violated the whistleblower policy. In the midst of the

meeting, in front of Mr. Rodgers, Mr. Sprengel directed everyone to look around the group and see that this was the most "diverse group at the company" and that if anyone was having issues with racism, to "speak up." Mr. Clayton felt humiliated since he knew that comment was directed to him in response to his complaints on racial discrimination.

24. On March 18, 2021, Mr. Clayton, Mr. Sprengel and Ms. Hartigan had a zoom meeting. Although it was clear during this meeting that Mr. Sprengel wanted no part in this meeting, he finally discussed Mr. Clayton's racial discrimination concerns. Further, during this meeting, Mr. Sprengel told Mr. Clayton that the position he was working towards, which was the same position that was technically created for Mr. Tozouno years prior, was being eliminated. Mr. Clayton was once again subjected to disparate treatment. When his White colleague, Mr. Tozouno transferred over to a different facility, Coach created a position for him, only to keep him on board. Alternatively, while Mr. Clayton was working hard to obtain that same position years later, Coach decided to eliminate the position while keeping the job duties and expectations the same.

25. In March of 2021, Mr. Clayton was told that Mr. Sprengel would be visiting Houston with Ms. Hartigan to discuss Mr. Clayton's concerns. However, this did not happen until July 2021, after Mr. Sprengel had left the company. Nevertheless, on July 20, 2021, Mr. Clayton attended a meeting scheduled with multiple personnel from the management team to discuss Mr. Clayton's concerns about racial discrimination at Coach. Although Mr. Sprengel wasn't in attendance, Mr. Rodgers attended this meeting. In this meeting, the attendees discussed favoritism, racism, and workplace bullying in general. Only a few months later, Ms. Hartigan also left the company. While seemingly Coach discussed Mr. Clayton's discrimination claims with him on many occasions, Coach failed to take any actual action to remedy the situation.

26. In August of 2021, a new Human Resources Safety Manager was hired for the

Texas region, Ray Segura, hereinafter ("Mr. Segura"). As management, Mr. Clayton and fellow colleague Willie Tamayo (hereinafter "Mr. Tamayo") requested a meeting with Mr. Segura to bring him up to speed on everything going on at Coach. On October 26, 2021, Mr. Tamayo, Mr. Clayton, and Mr. Segura had the meeting in which they discussed everything, and this meeting concluded with Mr. Segura assuring Mr. Clayton and Mr. Tamayo that he would take care to report the situation to the right people. Mr. Clayton was very relieved that finally his concerns would be addressed within the company. However, his relief quickly diminished when he saw Mr. Segura the next day in the office. The next day, Mr. Segura acted as if there had been no meeting the day before; in fact, he was avoiding all communication with both Mr. Tamayo and Mr. Clayton. When they finally had a moment with Mr. Segura, they inquired about his peculiar behavior and Mr. Segura then stated that Coach was 'corrupt' and therefore both Mr. Tamayo and Mr. Clayton should 'get their resumes together' inferring that they prepare to leave the company. Mr. Clayton then feared retaliation and termination like never before but was absolutely sure that Coach was not interested in resolving things and would only continue to cover things up. Mr. Clayton noticed not too long after that Mr. Segura was first ripped of his HR title, and then resigned only shortly after. In November of 2021, Mr. Segura's replacement, Ed Henry (hereinafter "Mr. Henry") was hired as the Corporate HR.

27.     On March 1, 2022, Mr. Henry, Mr. Rodgers, and Derrick Kaskimerski (hereinafter "Mr. Kaskimerski"), vice president of the Southeast region, came to Houston to meet with Mr. Clayton and discuss his recently filed complaints. Prior to this meeting, Mr. Clayton did not have a chance to meet with Mr. Henry, and therefore, he could sense that Mr. Henry's initial perspective of him had been most likely influenced by any negative comments made by Mr. Rodgers. Upon being questioned about his concerns with the company, Mr. Clayton explained that as a Black man

working for Coach, had no advancement opportunities. In fact, he stated, all the opportunities disappeared when the White colleagues left Coach. The following day, Mr. Clayton had a one-on-one with Mr. Henry. During this meeting, Mr. Henry and Mr. Clayton discussed everything. Clearly annoyed by Coach's treatment of Mr. Clayton and fellow black colleagues, Mr. Henry approached the corporate office with questions and concerns. As a result of this, Mr. Henry was terminated within the same month on March 30, 2022. However, a day after his termination, on April 1, 2022, Mr. Henry reached out to Mr. Clayton and encouraged him to leave Coach stating that the company was "corrupt", and that Coach was seeking to terminate Mr. Clayton as well, as soon as possible. Mr. Clayton was dismayed at the fact that this Black HR manager had been terminated by Coach after attempting to resolve employee concerns of discrimination. It was clear that Coach devalued its black employees and found them easily replaceable.

28. Only days later, April 7, 2022, Mr. Rodgers and Mr. Kaskimerski unexpectedly showed up to Mr. Clayton's office. Although Mr. Kaskimerski was there most of the day, almost immediately after he left, Mr. Rodgers called Mr. Clayton to his office. Once in Mr. Rodgers' office, Mr. Clayton was told about a Performance Improvement Plan (PIP) that Coach was issuing him. He was told that he had twenty-four hours to sign it and should he fail to sign the PIP, he could lose his job. Mr. Clayton immediately told Mr. Rodgers that he believed the PIP to be fabricated. Mr. Clayton found it interesting that Mr. Rodgers issued the PIP after Mr. Kaskimerski left for the day, Defendants were apparently attempting to be shielded by having this Black manager issue the document.

29. On April 27, 2022, Mr. Clayton formalized an email to Coach disputing the contents and issuance of the PIP. Mr. Clayton expressed concerns that he failed to understand how PIP came into existence when he had never received even one negative evaluation or write-up in his ten years

at Coach. Mr. Clayton requested information about the specific meetings that were documented in his PIP allegedly reflecting his work performance.

30. On June 20, 2022, Mr. Clayton had his first PIP meeting. Afterwards, the HR manager at the time, Michael Smith (hereinafter "Mr. Smith") sent over a detailed email outlining the meeting. Upon being asked whether this PIP was valid, Mr. Smith had no response for Mr. Clayton. Further, Mr. Clayton still had not received a response to his PIP-related email inquiry to the corporate office. On July 6, 2022, Mr. Clayton sent an email to Mr. Smith outlining the racial discrimination he experienced at Coach. Further, Mr. Clayton mentioned that Black and Mexican employees were paid less than similarly situated white colleagues. Mr. Clayton also inquired about the validity of the PIP since he explained that Mr. Rodgers had included many odd dates in there that didn't relate to his performance whatsoever. Mr. Clayton asked Mr. Smith why Mr. Rodgers was the manager issuing the PIP when Coach was very well aware of the relationship between Mr. Rodgers and Mr. Clayton. Mr. Clayton wanted to know why Mr. Henry or Mr. Kaskimerski did not issue it seeing as how they were his direct supervisors.

31. On July 20, 2022, Mr. Clayton finally received a response from HR, Ms. Hartigan, regarding his complaints. Ms. Hartigan notified Mr. Clayton that his claims had all been closed. Ms. Hartigan also alleged that Mr. Henry was responsible for issuing the PIP. Mr. Clayton found this rather odd since Mr. Henry was no longer with the company and Mr. Rogers was the individual who delivered it to Mr. Clayton.  Then, on August 30, 2022, Mr. Kaskimerski and Mr. Smith came to Mr. Clayton's office and terminated Mr. Clayton. Coach retaliated against Mr. Clayton by terminating him less than a month after his most recent complaint on racial discrimination. In fact, Coach had been targeting Mr. Clayton for quite some time now ever since his initial complaints of racial discrimination and only used the PIP to pretextually manage him out. Mr. Clayton has been

unjustly discriminated and retaliated against by Defendants.

## VI.     FIRST CAUSE OF ACTION: TITLE VII DISCRIMINATION BASED ON RACE

32.     Plaintiff reasserts and incorporates by reference all of the above numbered paragraphs.

33.     As an African American, Plaintiff is a member of a protected category.

34.     Plaintiff was qualified for his position and was subjected to adverse employment actions in whole or in part because of his race and after he complained multiple times of discriminatory treatment.

35.     Plaintiff experienced disparate treatment in that he was treated differently in terms of disciplinary issues, job assignments, compensation, raises and promotions, then other similarly situated White employees.

36.     After Plaintiff began to file these complaints, Defendants' attitude toward him immediately became more hostile.

37.     Plaintiff's protected activity eventually led to his retaliatory termination.

38.      Pursuant to Title VII of the Civil Rights Act of 1964, as amended, Plaintiff pleads a cause of action against Defendants for racial discrimination.

## VII.    SECOND CAUSE OF ACTION: §1981 RACIAL DISCRIMINATION

39.     Plaintiff reasserts and incorporates by reference all of the above numbered paragraphs.

40.     The Civil Rights Act of 1866 prohibits discrimination against any individual because of that individual's race.  See 42 U.S.C. § 1981.

41.     Pursuant to 42 U.S.C. § 1981 Plaintiff pleads a cause of action against Defendants for racial discrimination.

42. Defendants engaged in discrimination against the Plaintiff, an African American male by disciplining him, discriminating against him, denying him promotion and terminating his employment based on his race.

43. The effect of these practices has been to deprive the Plaintiff of the ability to gain promotions and pay raises and to otherwise adversely affect his status as an employee.

44. When Plaintiff complained of the harassment and discrimination he was enduring, Defendants escalated its discrimination and harassment of Plaintiff and retaliated against Plaintiff.

45. Plaintiff alleges that the Defendants discriminated against him by denying him promotion and pay and by retaliating against him and terminating him based on his race in violation of Section 1981 of the Civil Rights Act of 1866.

46. The effect of these practices has been to adversely affect his status as an employee.

## VIII.  THIRD CAUSE OF ACTION: TITLE VII RETALIATION

47. Plaintiff reasserts and incorporates by reference all of the above numbered paragraphs.

48. Plaintiff experienced retaliation for opposing Defendants' discriminatory employment practices. He engaged in activities protected by Title VII, as amended, when he complained about discrimination.

49. After Plaintiff began to file these complaints, Defendants' attitude toward him immediately became more hostile.

50. Plaintiff's protected activity eventually resulted in his being placed on a PIP and terminated, based on pretext.

## IX.  FOURTH CAUSE OF ACTION: SECTION 1981 RETALIATION

51. Plaintiff reasserts and incorporates by reference all of the above numbered

paragraphs.

52. Plaintiff experienced retaliation for opposing Defendants' discriminatory employment practices. He engaged in activities protected by Section 1981 when he complained about discrimination.

53. After Plaintiff began to file these complaints, Defendants' attitude toward him immediately became more hostile.

54. Plaintiff's protected activity eventually resulted in his being placed on a PIP and terminated based on pretext.

## X.   DAMAGES

1. Plaintiff sustained damages as a result of the actions and/or omissions of Defendants as described herein. Accordingly, Plaintiff is entitled to an award of actual and compensatory damages, including lost wages and benefits in the past and future, in an amount within the jurisdictional limits of the Court. Plaintiff also seeks an award of damages for the mental anguish and pain and suffering he has suffered, continue to suffer, and will suffer in the future.

2. Additionally, as a result of Defendants' above-referenced actions and/or omissions, Plaintiff was required to retain counsel to protect and enforce his legal rights. Accordingly, Plaintiff also seeks compensation for his attorneys' fees, as well as out-of-pocket expenses, expert fees and costs of Court he will have incurred in this action.

## XI.   PUNITIVE DAMAGES

3. Plaintiff would further show that the acts and omissions of Defendants complained of herein were committed with malice or reckless indifference to his protected rights. In order to punish said Defendants for engaging in unlawful business practices and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendants for punitive damages.

## XIII. J<small>URY</small> D<small>EMAND</small>

4.	Plaintiff demands a jury on all issues to be tried in this matter. Plaintiff has submitted the jury demand and herein submit the jury fee.

## XIV. P<small>RAYER</small>

5.	For the reasons set forth above, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for:

a.	All damages to which Plaintiff may be entitled pursuant to this First Amended Complaint, or an amendment thereto, including but not limited to back pay, reinstatement, upgrading, and compensation for benefits not received;

b.	Lost wages in the future;

c.	Past physical pain and mental suffering;

d.	Present physical pain and mental suffering;

e.	Future physical pain and mental suffering;

f.	Actual, liquidated, compensatory, and punitive damages in an amount within the jurisdictional limits of the Court;

g.	Reasonable attorneys' fees as allowed by law, with conditional awards in the event of appeal;

h.	Prejudgment interest at the highest rate permitted by law;

i.	Post-judgment interest from the judgment until paid at the highest rate permitted by law;

j.	Costs of Court; and

k.	Such other and further relief, at law or in equity, to which Plaintiff may be entitled,

whether by this Original Complaint or by proper amendment thereto.

Respectfully Submitted,
TB Robinson Law Group, PLLC

_____
Terrence B. Robinson
Fed. Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Claudia Casas
Fed Bar No, 3573914
Texas Bar No.24110850
Email: CCasas@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4288
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, the foregoing *Plaintiff's First Amended Complaint was* electronically filed with the Clerk of Court using the CM/ECF system and served on all attorney(s) and/or parties of record via CM/ECF service.

_____